# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00274-CV

---

**Tabitha Marie Anastasi, Appellant**

**v.**

**Dwayne Allen McHorse, II, Appellee**

---

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-20-002852
### THE HONORABLE AURORA MARTINEZ-JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

In this appeal from a suit to modify the parent-child relationship, Tabitha Marie Anastasi (Mother), acting pro se, challenges the trial court's order that appointed Dwayne Allen McHorse, II (Father) the sole managing conservator of the parties' child (Child), appointed Mother possessory conservator of Child, and ordered Mother to pay child support, attorney's fees, and other costs. For the following reasons, we affirm the trial court's order.

## BACKGROUND

In December 2020, the trial court signed an agreed final decree of divorce, dissolving the marriage between Mother and Father.[1] The trial court appointed the parties joint

---

[1]    Mother refers to herself as Tabitha Marie Anastasi-McHorse and Tabitha Marie Anastasi. We refer to her as Tabitha Marie Anastasi because the final decree of divorce restored her name to Tabitha Marie Anastasi and the order being appealed refers to her as Tabitha Marie Anastasi.

managing conservators of Child, who was almost three; gave Mother the exclusive right to designate Child's primary residence; and ordered modified standard possession. Father's visitation with Child was generally two weekends each month with extended summer possession and FaceTime access three days each week. In the final decree, the trial court also ordered Father to pay child support and other costs such as for Child's health insurance, and the parties were ordered to communicate through Our Family Wizard. After the parties' divorce, Child and Mother lived in Hockley, Texas, with Child's maternal grandmother and step-grandfather; and Father, who also has five older children from previous relationships, remarried, lived with his new wife in Round Rock, Texas, and had another child with his new wife.

In August 2021, Father filed a petition to modify the parent-child relationship and request for a temporary restraining order, alleging that Mother had "continuously and repeatedly filed false abuse allegations against [Father] and subjected the child to almost constant involvement with [Child Protective Services] CPS," including "invasive forensic exams at the Child Advocacy Center and hospital." In his supporting declaration, Father stated concerns about Child's safety and welfare, Mother's interference with his contact with Child, her failure to provide information about Child, and her improper coaching of Child. At the time Father filed his petition, CPS had ruled out multiple allegations by Mother that Father and his wife had abused Child. The ruled-out allegations included that in November 2020, Father had sexually abused Child; in January 2021, Father had physically abused Child; and in August 2021, Father's wife had physically abused Child. Shortly before Father filed his petition, Mother also had taken Child to the hospital alleging sexual abuse, and she had called the police to report bruising and inflammation on Child and her belief that Child had been sexually assaulted while at Father's

house over the weekend.[2]  Shortly after Father filed his petition, the trial court ordered Mother to provide information about Child to Father and enjoined the parties from taking Child to medical appointments without providing advance notice to the other party, but Child continued to live with Mother and her maternal grandmother and step-grandfather and to visit with Father generally as provided under the terms of the final decree of divorce.

In response to Father's petition, Mother filed a counterpetition to modify the parent-child relationship.  In their petitions, both parties alleged that there had been a material and substantial change after the final decree of divorce and that modification would be in the best interest of Child.  *See* Tex. Fam. Code § 156.101(a) (addressing grounds for modification of order establishing conservatorship).  They sought to be appointed Child's sole managing conservator, to limit the other parties' visitation with Child, and to be awarded child support and permanent injunctive relief.

In March 2022, without providing notice to Father, Mother again took Child to the hospital because of an alleged outcry by Child of abuse when Child was at Father's house for a visit.[3]  Mother alleged that Child told her that Father's nine-year-old daughter from a previous relationship had "stuck her finger in [Child's] butt" "real far" and "[i]t bled" when Child was at

---

[2]  In conflict with a police incident report that was admitted at the final hearing, Mother testified that she had not made a sexual abuse allegation at that time but admitted to calling the police.  Mother also later reported to the police that Child had been with her that weekend and not with Father, that she had taken Child to the doctor, and that there were no concerns.  She explained that she provided incorrect information because of an ear infection.

[3]  In her reply brief, Mother argues that she was not required to provide notice prior to taking Child to the hospital because it was an emergency and that she provided notice to Father the following day.  The temporary order enjoined the parties, absent an emergency, from taking Child to medical appointments without giving notice via Our Family Wizard at least 24 hours in advance and ordered that both parents shall be permitted to attend the appointment in person or, if they could not physically be present, to attend via Facetime or phone call.

Father's house. This allegation was not true because Father's older daughter had not been at the house when Child was visiting and had not seen Child in person since December 2020, but a SANE exam was performed on Child at the hospital that found the presence of sperm around Child's vaginal area. After the presence of sperm was found on Child, Father "agreed to do anything" CPS asked, including agreeing not to be alone with Child, submitting to DNA testing, and putting cameras around his house to ensure Child's safety. Child's maternal step-grandfather also submitted to DNA testing. The DNA testing was unable to identify the perpetrator, and CPS closed its investigation.[4]

Pursuant to temporary orders, Child began living with Father and his wife in May 2022. The trial court ordered the parties to follow all safety plans put in place by CPS and for Mother's visits to be supervised with specified conditions.[5] From May 2022 to the final hearing, Mother participated in only one in-person visit with Child and a few video calls. Mother's last contact with Child was in the summer of 2022. When the final hearing occurred on April 6 and 7, 2023, Child had been continuously living with Father since May 2022.

The witnesses at the final hearing were the parties, the court-appointed guardian ad litem, and Father's attorney who testified about Father's incurred attorney's fees. Although Mother had been represented by counsel during the case, she was acting pro se by the time of the

---

[4] According to a related police report that was admitted as evidence at the final hearing, "there was not enough DNA collected from the victim to create a DNA profile that could be used for comparison." The report also states that Mother "used her government email to contact the lab and release the evidence to her." Mother worked for the Texas Department of Health and Human Services.

[5] Specifically, prior to supervised visitation beginning, Mother was ordered to provide proof to CPS and Father's counsel that "she has secured cameras in her residence that shall remain on and capture and store all footage of the child while in her home."

final hearing.[6]  The trial court took judicial notice of the case's file, and the exhibits included CPS's closing letters documenting that Mother's reported allegations against Father and his wife had been ruled out, correspondence between the parties on Our Family Wizard and by text and email, photographs of Child and others, the medical forensic chart from March 2022 for "acute medical forensic exam of a 4 y F for concerns of sexual assault" and related police reports, the reporter's record from a hearing in August 2022 on the trial court's temporary orders,[7] receipts of incurred costs by Father, and records from Father's attorney itemizing incurred attorney's fees.

Father testified about his remarriage after his divorce from Mother; the birth of his youngest child, who was four months old at the time of the final hearing; and his five older children from previous relationships.  Father also testified about his concerns with Child's safety and welfare when in Mother's care, Mother's allegations against him and his wife, and other conduct by Mother that led him to file the petition to modify.  Father testified about Mother's multiple reports to CPS of alleged abuse of Child by him and his wife, CPS's determinations that

---

[6]  A few weeks before trial, with Mother's consent, the trial court granted her counsel's motion to withdraw, and Mother proceeded pro se.

[7]  The August 2022 hearing concerned Child's placement pending the results of the DNA testing.  The trial court took judicial notice of the guardian ad litem's report, and the CPS investigator who was assigned to the case testified about the safety measures that were in place to protect Child at the parties' houses and ongoing concerns with Child's safety and exposure to coaching by Mother.  The CPS investigator had "general concerns due to the fact that sperm was found around this child's private areas" but testified that CPS would be closing its case because it did not have a designated perpetrator.  The investigator further testified that Child "did not make any outcries" or "appear uncomfortable at all" during the secondary forensic interview and that it appeared that the previous outcry was invalid and "found not to be possible."  The investigator testified that "given the information that we have," CPS had concerns that Child had been and would continue to be exposed to coaching by Mother. The investigator also testified that Father's house had more safety measures in place than Mother's house.

5

the allegations were ruled out, and Father's concerns with Child's safety around Child's maternal step-grandfather. He testified that Mother had told him about her stepfather's "inappropriate" conduct toward Mother, including buying her "some lingerie" for an "out-of-town" trip that she took with him, and that Child's therapist had raised concerns about the step-grandfather. Father also recounted an incident prior to his filing the petition to modify where Mother refused to allow him visitation and testified that after the parties' divorce, his FaceTime visits with Child started out fine, but as time progressed, became less and less so and then eventually his calls for his FaceTime visits were not answered.

Father further testified about the parties' conduct and actions during the case, including about the March 2022 outcry by Child and how Child was doing after May 2022 when she began living in his home. Father testified that Child was happy, doing well in their home and at school, had friends in the neighborhood, was in therapy, and had not made any outcries of abuse after she began living with him. Father also testified about Mother's lack of contact with Child, his efforts to facilitate contact between them, and Mother's lack of financial support. Father testified that Mother had not provided any financial support after Child began living with him and that he had received "very little, if any" messages from Mother on Our Family Wizard after May 2022.

Mother testified about what happened in March 2022 when Child made the outcry, her continued concerns with Child's safety in Father's care, and Father's alleged failure to provide her with information about Child. As to the allegation that her stepfather had acted inappropriately, she admitted that he had given her a "nightgown" "back in 2020" but testified it was given to her to rekindle her relationship with Father. Mother admitted that the records reflect that there was concern that she was coaching Child, but she denied telling Child what to

6

say when interviewed. She testified that she told Child to tell the truth. Mother also admitted that she used her ".gov work email" to send an email to the lab conducting the DNA testing and that the lab sent her the results. She testified that she worked for the Department of Health and Human Services and that her job duties included investigating abuse and neglect of children in the foster care system. During her testimony, Mother attempted to admit exhibits, but some of them were not admitted because the trial court sustained Father's objections to their admission.

The guardian ad litem, who was appointed in September 2021, testified about her involvement in the case, including her interactions with the parties and Child, and her recommendations. She believed that it was in Child's best interest to remain with Father and his wife and to resume visitation with Mother gradually, starting with supervised visitation. The guardian ad litem did not have concerns about Child's safety or ability to thrive in Father's house, believed Father could co-parent with Mother, and expressed concerns with Mother's coaching Child. As to Mother's lack of contact with Child, the guardian ad litem testified that Mother did not provide the guardian ad litem with an explanation for why Mother was not visiting with Child, that the guardian ad litem had tried to facilitate contact with Mother and Child, and that Mother's friend told her that Mother decided not to see Child to prove that Child was not doing well in Father's custody. The exhibits included the guardian ad litem's report to the court.

In the final order, the trial court removed the parties as joint managing conservators; appointed Father as the sole managing conservator with specified exclusive rights, including the right to designate Child's primary residence; and appointed Mother as the possessory conservator. The trial court ordered that visits between Mother and Child were to be supervised until at least the beginning of the 2023-2024 school year and, after that, visitation

7

would be under a standard possession schedule if Mother complied with specified conditions. The trial court also ordered Mother to pay child support, retroactive child support, reimbursement for her psychological evaluation, and Father's incurred attorney's fees and other costs. This appeal followed.

## ANALYSIS

In six overlapping issues, Mother challenges the trial court's removal of the parties as joint managing conservators and appointment of Father as Child's sole managing conservator with exclusive rights to make decisions about Child and asks this Court to return Child to her care. Mother also challenges evidentiary rulings by the trial court and its order for her to pay attorney's fees, child support, and other costs and contends that the trial court violated her constitutional rights and right to a fair trial.

**Standard of Review**

When a trial court modifies conservatorship, we review that decision under an abuse-of-discretion standard of review. *See Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied) (explaining that trial court's decision to modify conservatorship is reviewed under abuse-of-discretion standard); *see also Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (holding that "trial court did not abuse its discretion in awarding custody of minor child to her father"); *In re L.M.M.*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *28–29 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.) (explaining that trial court has discretion to determine terms and conditions of conservatorship). Under this standard, "legal and factual sufficiency of the evidence are not independent grounds for asserting error but are relevant factors in determining whether the trial court abused its discretion." *Coburn*

8

*v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (citing *Zeifman*, 212 S.W.3d at 587). We first determine "whether the trial court had sufficient information on which to exercise its discretion" and, if so, "whether the trial court erred in its application of discretion." *Zeifman*, 212 S.W.3d at 588 (citing *Echols v. Olivarez*, 85 S.W.3d 475, 477–78 (Tex. App.—Austin 2002, no pet.)); *see Gillespie*, 644 S.W.2d at 451 (concluding that there was "sufficient competent evidence to support the trial court's determination that the best interest of the child would be served by appointing her father as managing conservator").

When, as here, the trial court has not filed findings of fact and conclusions of law, we imply all necessary findings to support the trial court's order. *Gardner v. McKenney*, No. 03-21-00130-CV, 2023 Tex. App. LEXIS 962, at *8–9 (Tex. App.—Austin Feb. 15, 2023, no pet.) (mem. op.) (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)). Further we "consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence." *Coburn*, 433 S.W.3d at 823 (citing *Worford,* 801 S.W.2d at 109); *see id.* at 823–24 (explaining that reviewing courts defer to trial court's "factual resolutions and any credibility determinations that may have affected those resolutions"). The trial court, the observer of "the witnesses' demeanor and personalities," does not abuse its discretion "as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Zeifman*, 212 S.W.3d at 587; *see In re O.G.*, No. 05-13-01263-CV, 2014 Tex. App. LEXIS 7021, at *7 (Tex. App.—Dallas June 26, 2014, no pet.) (mem. op.) (explaining that "question of conservatorship of a child is left to the trial court's discretion because it is in the best position to observe the demeanor and personalities of the witnesses and can feel the forces, powers, and influences that cannot be discerned by merely reading the record" (citation and internal citations omitted)).

9

**Briefing Requirements**

As a threshold matter, we address Father's argument that Mother has committed briefing waiver by failing to adequately present the arguments in her brief. Father argues that Mother failed to point to proper legal authority, cite to the record, or provide analysis with respect to the issues that she identified in her brief. *See* Tex. R. App. P. 38.1(i) (requiring appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *LMP Austin Eng. Aire, LLC through Lafayette Eng. Partner, LLC v. Lafayette Eng. Apartments, LP*, 654 S.W.3d 265, 291 (Tex. App.—Austin 2022, no pet.) ("When, as here, a party fails to properly cite to the record and omits meaningful argument, appellate courts may consider the issue waived due to inadequate briefing.").

We must hold Mother to the same standards as parties represented by counsel. *See Shockley v. Yalk*, No. 07-22-00128-CV, 2023 Tex. App. LEXIS 938, at *2 (Tex. App.—Amarillo Feb. 14, 2023, no pet.) (mem. op.) (explaining that "pro se litigant is held to the same standard as an attorney and must comply with the Texas Rules of Appellate Procedure"); *E.T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-15-00274-CV, 2015 Tex. App. LEXIS 10072, at *14 (Tex. App.—Austin Sept. 29, 2015, no pet.) (mem. op.) (holding "pro se litigants to the same standards as licensed attorneys and requir[ing] them to comply with the applicable rules of procedure" (citing *Wheeler v. Green*, 157 S.W.3d 439, 444 (Tex. 2005) (per curiam))); *see Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978) (explaining that pro se litigants are subject to same procedural rules "or else they would be given an unfair advantage over litigants represented by counsel").

We, however, also must construe briefs "liberally, but reasonably" "so that the right to appeal is not lost by waiver." *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 733 (Tex. 2020) (quoting *Horton v. Stovall*, 591 S.W.3d 567, 569 (Tex. 2019) (per curiam)); *see id.* (stating that courts should consider "the arguments, evidence, and citations relied on by those parties to determine which issues the parties intended to and actually briefed" when considering waiver (citations omitted)). Construing Mother's briefing under this standard, we address her issues as best as we can.

**Appointment of Father as the Sole Managing Conservator**

In her first, third, and fourth issues, Mother appears to challenge the sufficiency of the evidence to support findings that it was in Child's best interest to remove the parties as joint managing conservators and to appoint Father as the sole managing conservator.

A trial court generally may modify conservatorship and possession and access to a child if the petitioning parent shows that modification would be in the best interest of the child and the circumstances of the child, a conservator, or other affected party "have materially and substantially changed" since the earlier of the date of the rendition of the order or the date of the signing of an agreement on which the order is based. *See* Tex. Fam. Code § 156.101(a)(1). In determining the issue of conservatorship, the child's best interest is the "primary consideration of the court," *id.* § 153.002, and a "trial court is given wide latitude in determining the best interests of a minor child," *Gillespie*, 644 S.W.2d at 451; *see also Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing non-exclusive factors for "ascertaining the best interest of the child").

Among her arguments, Mother contends that joint conservatorship should have been granted "fairly and equally" to allow her to share in decisions concerning Child and that it

11

was not in Child's best interest for Father to be appointed sole managing conservator because Father was the "prime suspect" in Child's "brutal sexual assault" or "someone within his house" and that he "lied" under oath about "relevant information pertaining to the case." *See* Tex. Fam. Code §§ 153.004 (addressing relevance of history of domestic violence or sexual abuse to trial court's conservatorship decisions), .005 (addressing appointment of sole or joint managing conservator and stating relevant considerations). Mother states that in March 2022, she took Child to the hospital because she believed Child; contends that she is not a danger to and has never abused Child, that she has not at any time been shown to be an unfit parent, that the trial court allowed and ignored risks to Child by placing her with Father, and that there was no basis as to "the allegation(s) of suspected 'coaching' by [her]"; and requests that this Court immediately return Child to her because there is "no legal basis" to keep Child from Mother, "an un-abusive parent." Mother argues that there was no evidence that she abused or injured Child and challenges the guardian ad litem's "custody evaluation" that "falsely reported no concerns regarding domestic violence" about Father.

As support for her requested relief, Mother states that she "feels her rights have been unilaterally terminated" and relies on cases addressing a parent's constitutional right to be free from unreasonable governmental interference and Texas Family Code provisions addressing the termination of parental rights. *See, e.g., id.* § 161.001 (stating grounds for involuntary termination of parent-child relationship); *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (discussing in context of constitutional challenge to statute, parents' fundamental right "to make decisions concerning the care, custody, and control of their children" without governmental interference); *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982) (holding that when seeking to terminate parental rights, due process requires State to support allegations against parent with

12

clear and convincing evidence). Mother also characterizes the trial court's temporary orders placing Child with Father as the "continual unconstitutional seizure" of Child, a "wrongful removal," and a violation of the Fourth Amendment and cites the clear-and-convincing burden of proof that is applicable in termination cases. *See* Tex. Fam. Code §§ 101.007 (defining "clear and convincing evidence"), 161.001(b) (authorizing court to order termination of parent-child relationship if court makes certain findings "by clear and convincing evidence").

Mother's cited cases and statutes, however, do not apply to this case between two parents seeking to modify their final decree of divorce concerning the conservatorship of Child. *See id.* § 156.101 (stating grounds for modifying order on conservatorship of Child). Mother has not challenged the constitutionality of a statute, and no governmental entity is a party or seeking to terminate her parental rights. Additionally, Father did not seek to terminate Mother's parental rights but to modify conservatorship. In its order, the trial court found that Father's requested modification was in the best interest of Child and that the appointment of the parties as joint managing conservators "would significantly impair the child's physical health or emotional development." *See id.* §§ 153.131 (stating that parents should be appointed joint managing conservators unless court finds that appointment of parent would not be in best interest of child because appointment would significantly impair child's physical health or emotional development and that there is rebuttable presumption that appointment of parents as joint managing conservators is in best interest of child), .134(a) (stating factors that courts should consider in determining whether appointing parents as joint managing conservators is in best interest of child).

As support for her contention that the trial court erred in its modification of conservatorship, Mother also relies on a supplemental report by a detective that was admitted as

an exhibit and concerned the March 2022 outcry and the evidence of Father's criminal history and alleged substance abuse. In the supplemental report, the detective stated that he had spoken to Father's older daughter's guardian who was her maternal grandmother, that she had reported that the older daughter had not seen Father or Child in almost two years, and that "she suspected [Father] or someone in his household of doing similar things to [the older daughter]." The detective, however, noted that he had requested an email from her with "any and all information" and that he was waiting for the email; neither the detective nor the guardian of Father's older daughter testified; and there was no other evidence to support grandmother's vague allegation against Father or someone in his household.

As to the evidence of Father's criminal history and alleged substance abuse, the guardian ad litem in her report to the court stated that Father reported to her his "pretty lengthy history of criminal behavior and incarceration." She recounted that Father told her that "he grew up 'in the projects' and engaged in all of the 'textbook activities' for 'a kid with no dad and guidance.'" But the Guardian ad litem also stated that Father told her that he "determined to 'clean [his] side of the street'" when he was 35 and in prison, that he had not used drugs since 2011, and that he denied "domestic violence" with Mother. In the December 2020 final decree of divorce, Father agreed that his unsupervised possession with Child would not occur until he obtained a Soberlink device and, if requested, a negative drug test, and there was no evidence that Father had violated this condition or that he had been engaging in criminal activity or abusing substances after the parties' divorce.

In making the required findings, including that the presumption had been rebutted that it would be in Child's best interest for the parties to continue as joint managing conservators, the trial court could have found credible the testimony of the guardian ad litem and Father that

14

supported that it was in Child's best interest to continue to live with Father and to remove the parties as joint managing conservators. Father testified that Child had been living with him since May 2022 and that Child was safe and thriving at his house and that he was seeking modification because of his concerns about Child's safety and welfare when Child was living with Mother based on Mother's multiple allegations that he and his wife had abused Child, her interference with his contact with Child, and her refusal to provide him with information about Child. *See id.* § 153.134(a) (listing, among factors, "whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators," "ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest," and "whether each parent can encourage and accept a positive relationship between the child and the other parent"). And the evidence was undisputed that Mother had very little contact with Child after May 2022 when Child began living with Father despite efforts by Father and the guardian ad litem to facilitate the contact. After that, Mother had only one in-person visit and a few video calls with Child and did not provide financial support for Child's care. The guardian ad litem did not have concerns with Child's safety or ability to thrive in Father's home, testified that Child had matured while at his home, and believed that he could co-parent, but she expressed concerns about Mother, including her coaching of Child and her lack of explanation for why she stopped contacting Child during the case.

The trial court also could have found Mother's testimony about Father's abuse of Child not credible and credited the evidence that CPS had ruled out Mother's allegations against Father and his wife; that Mother had coached Child to make the allegations; that Father had complied with CPS's safety plan after March 2022; that the CPS cases and police investigations

against Father were closed; and that Mother violated court orders, including not providing information about Child to Father, and took Child to the hospital in March 2022 without providing notice to Father until the following day. *See Coburn*, 433 S.W.3d at 823–24 (explaining that reviewing courts defer to trial court's "factual resolutions and any credibility determinations that may have affected those resolutions"); *see, e.g*, *In re Harrison*, 557 S.W.3d 99, 132–33 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (citing evidence that mother "displayed an inability to follow court orders grounded on the children's best interests" "and attempted to alienate the children from [the father]" and collecting cases in which appellate court affirmed modification orders in part due to parent's interference with other parent's relationship with child).

As part of these issues, Mother also argues that the trial court erred by not allowing her to have access to Child's teachers and doctors or to take part in legal, educational, and medical decisions concerning Child. Although the trial court granted Father the exclusive rights to consent to medical, dental, and surgical treatment involving invasive procedure; to represent Child in legal actions; and to make "other decisions of substantial legal significance concerning the child," the trial court appointed Mother possessory conservator with the rights to consent for Child to receive medical and dental care not involving an invasive procedure; to receive information from Father concerning Child's health, education, and welfare; of access to medical, dental, psychological, and educational records of Child; and to consult with school officials concerning Child and to attend school activities. The trial court also ordered Father to inform Mother "in a timely manner of significant information concerning the health, education, and welfare of [Child]" and provided the steps for Mother to have access and possession of Child under a modified standard possession order. Given the above-described evidence of Mother's

16

actions prior to and during the case that the trial court reasonably could have found credible and concerning as to Child's safety and welfare, we cannot conclude that the trial court abused its discretion in its decisions to appoint Father as the sole managing conservator with certain specified exclusive rights. *See* Tex. Fam. Code § 153.132 (listing exclusive rights for parent appointed as sole managing conservator).

Applying the applicable standards, we conclude that there was evidence of a substantive and probative character to support the trial court's required findings and, thus, that the trial court did not abuse its discretion when it modified the final decree of divorce to remove the parents as joint managing conservators and to appoint Father as Child's sole managing conservator with certain specified exclusive rights. *See id.* § 156.101(a); *Zeifman*, 212 S.W.3d at 587–88. We overrule Mother's first, third, and fourth issues.[8]

**Attorney's Fees and Other Awarded Amounts**

In her second issue, Mother contends that the trial court erred by ordering her to pay Father's attorney's fees and "other inordinate fees" and characterizes the amounts that she is required to pay as punishment and "punitive measures" against her. In addition to attorney's

---

[8] To the extent Mother also challenges the trial court's finding that a material and substantial change had occurred after the rendition of the final decree of divorce, we similarly conclude that there was "evidence of a substantive and probative character" to support this finding. *See Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). In making this finding, the trial court could have considered Mother's counterpetition that alleged a material and substantial change and credited the evidence of Mother's multiple allegations to CPS, the police, and medical personnel of abuse to Child by Father and his wife and Mother's interference with Father's visitation and contact with Child. *See Coburn v. Moreland*, 433 S.W.3d 809, 828–29 (Tex. App.—Austin 2014, no pet.) (concluding that there was ample evidence of material and substantial change "in the parties' ability to effectively co-parent since rendition of the agreed divorce decree" and that parent judicially admitted element because counterpetition for modification of conservatorship "alleged a material and substantial change in circumstances" (citing *In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.))).

fees, Mother challenges the award of child support, retroactive child support, and reimbursement of health and dental insurance and the cost of a psychological evaluation.

*Attorney's Fees*

It is within the trial court's discretion to award reasonable attorney's fees in a suit affecting the parent-child relationship. *See* Tex. Fam. Code § 106.002(a) (stating that trial court may render judgment for reasonable attorney's fees and expenses in suit affecting parent-child relationship); *In re R.C.S.*, 167 S.W.3d 145, 152 (Tex. App.—Dallas 2005, pet. denied) (stating that it is within trial court's "sound discretion to award reasonable attorney's fees in a suit affecting the parent-child relationship"). To support an award of attorney's fees, the evidence should include at least:

> evidence of (1) particular services performed, (2) who performed those services, (3) approximately when those services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services.

*Rohrmoos Ventures v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 502 (Tex. 2019) (citing *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762–63 (Tex. 2012)); *see id.* at 501–02 (summarizing method to determine reasonableness and necessity of attorney's fees).

In the modification order, the trial court ordered Mother to pay $25,296.74 for Father's attorney's fees. This amount of awarded attorney's fees is supported by Father's attorney's testimony and billing records. *See id.* His attorney testified that her rate was reasonable given the rates of attorneys with similar levels of experience in the area and that her work was reasonable and necessary, and the admitted billing records provided an itemization of her fees of $25,296.74, including the date, amount of time spent, and the work performed per

entry.  Mother did not object to this evidence or question Father's attorney.  Given the trial court's findings on modification, we cannot conclude that the trial court abused its discretion in its award of attorney's fees.  *See In re R.C.S.*, 167 S.W.3d at 152.

*Reimbursement for Cost of Psychological Evaluation*

Mother also challenges the requirement in the trial court's order that she reimburse Father $3,500 for the cost of a court-ordered psychological evaluation of her from April 2022.  The exhibits at trial included the order for psychological evaluation of Mother.  Under the terms of that order, Father was ordered to pay the initial fee of the evaluation but "all fees related to the psychological evaluation" were "subject to allocation by the Court" at the final hearing.  Given the evidence of Mother's conduct leading up to the trial court's order for a psychological evaluation of Mother and her lack of financial support for Child's care after May 2022, we cannot conclude that Mother has shown that the trial court abused its discretion in allocating the cost of the evaluation to her.

*Child Support*

Mother further challenges the trial court's order to the extent it requires her to pay child support and to reimburse Father for medical and dental insurance.  *See* Tex. Fam. Code § 156.401 (addressing grounds for modification of child support).  She argues that the amount of child support is above the State and Texas Family Code guidelines, that she was the parent who had carried Child's insurance since birth, and that Father was delinquent to reimburse funds owed to Mother.  In its order, the trial court ordered Mother to pay $4,016.43 for retroactive child support, and to pay monthly child support of $365.13, medical insurance reimbursement of

19

$235.27, and dental insurance reimbursement of $47.59. Mother relies on her filing for "financial hardship and indigency as well as the two-income household of [Father]."

We review a trial court's decision to award child support under an abuse-of-discretion standard of review. *See Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011) (stating that "order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion" (quoting *Worford*, 801 S.W.2d at 109)). "A trial court has discretion to set child support within the parameters provided by the Texas Family Code." *Id.*; *see also* Tex. Fam. Code §§ 154.121–.125 (providing child support guidelines to parent's net resources). To determine the amount of income available for child support, the court must calculate the parent's net resources. *See* Tex. Fam. Code § 154.062 (providing guidelines for determining parent's net resources). When child support is awarded, the trial court also generally orders medical support and dental support and prioritizes health insurance and dental care coverage available through an employer. *See id.* §§ 154.181, .1815, .182, .1825.

Mother does not state what she believes would have been the correct amounts of support. The evidence showed that Mother had not provided financial support for Child's care for almost one year at the time of the final hearing, *see id.* § 154.131 (addressing retroactive child support); her tax returns for 2021 and 2022 and evidence about the cost of dental and medical insurance through Father's wife's employment were admitted as exhibits; and Mother's proposed support decision filed with the trial court represented that her monthly gross wages and salary income were $2,429.97.[9] Based on the evidence and representations of her resources, we

---

[9] Mother filed an affidavit of indigency in March 2023 with the trial court. She swore that her total monthly income was $2,200 and that her monthly expenses were $2,150, but she represented that her expenses included $150 for "school/child care" and $850 for "rent/house

cannot conclude that Mother has shown that the trial court abused its discretion in the amount of child support and retroactive child support that it ordered her to pay. *See id.* § 154.125 (applying guidelines to net resources); *Iliff*, 339 S.W.3d at 78. As to Mother's argument that she has been the one providing insurance for Child, we also cannot conclude that the trial court abused its discretion by ordering Father to obtain the medical and dental insurance and for Mother to reimburse the monthly costs. Child had been living with Father, and Father presented evidence about the insurance that was available through his wife's employment.

For these reasons, we overrule Mother's second issue.

**Evidentiary Challenges and Fairness of Trial**

In her fifth and sixth issues, Mother repeats arguments that she makes in her first, third, and fourth issues; argues that the trial court violated her fundamental parental rights that are protected by Due Process and the Fourteenth Amendment and other constitutional rights; and argues that the trial court "erred in the denial and violation of [her] right to a fair trial." Mother complains about the exclusion of "crucial exhibit(s) that would have provided relevant information" and the admission of Father's evidence that was not disclosed prior to trial. She also complains about the denial of her "right to have further testing done on the sexual assault predator" and argues that the guardian ad litem committed fraud on the court "by making false statements under oath regarding critical facts of the case," that the trial court refused to allow her to question the guardian ad litem or Father, and that the trial court did not "allow sufficient and equal time" to her to present her case. She also disputes that she used her work email

___

payments, maintenance." At that point, Child was living with Father, and Mother was living in the home of her mother and step-father.

21

improperly, contending that she had only requested a "timeframe" for the completion of the DNA testing from the lab.

Mother did not raise the complaints with the trial court that she raises on appeal about how the trial court conducted the final hearing, such as the amount of time she had to present her case and, therefore, she has not preserved them for our review. *See* Tex. R. App. P. 33.1(a) (addressing preservation of error); *P.R.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-16-00065-CV, 2016 Tex. App. LEXIS 9468, at *9 (Tex. App.—Austin Aug. 26, 2016, no pet.) (mem. op.) (overruling due process arguments because they were not presented to trial court and thereby preserved for appellate review); *In re D.W.*, 249 S.W.3d 625, 631 (Tex. App.—Fort Worth 2008, pet. denied) (overruling constitutional challenge to statute because challenge was not raised with trial court).

For example, to preserve her complaint about the trial court's time limits, Mother was required to make a timely, specific objection at the earliest possible opportunity to the time limits set by the trial court, but she did not do so nor did she provide proof concerning the evidence that she would have offered absent the time limits. Therefore, any error by the trial court as to the time limits is waived. *See In re A.E.A.*, 406 S.W.3d 404, 420 (Tex. App.—Fort Worth 2013, no pet.) (stating that appellate court had nothing to review because appellant did not object to "time limit nor make offer of proof concerning evidence that was excluded because of the allegedly restrictive time constraints"); *Health Enrichment & Longevity Inst., Inc. v. State*, No. 03-03-00578-CV, 2004 Tex. App. LEXIS 6246, at *15 (Tex. App.—Austin July 15, 2004, no pet.) (mem. op.) (holding that there was nothing to review because appellants did not make offer of proof concerning evidence that was excluded due to time constraints); *Schwartz v. Forest Pharms., Inc.*, 127 S.W.3d 118, 126–27 (Tex. App.—Houston [1st Dist.] 2003, pet.

22

denied) (concluding that appellant waived complaint about time limit because appellant did not object to time limit at trial). Mother also has not shown how or when the trial court prevented her from questioning Father or the guardian ad litem or that she properly and timely objected to any such prevention.[10]

As to her complaints about the admission and exclusion of evidence, Mother similarly has not preserved her complaints for our review. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a) (addressing preservation of rulings on evidence). Mother contends that the trial court erred in admitting Father's evidence that was not disclosed prior to trial and excluding "crucial exhibit(s)," generally citing volume 1 of the reporter's record that lists the exhibits that were offered and whether they were admitted or not, but she does not provide argument or authority for why the trial court erred in excluding or admitting any particular exhibit over a proper objection or provide an offer of proof of the excluded evidence. *See McKinnon v. Wallin*, No. 03-17-00592-CV, 2018 Tex. App. LEXIS 6349, at *8 (Tex. App.—Austin Aug. 14, 2018, pet denied) (mem. op.) (concluding that appellant had not preserved complaint for review as to excluded evidence because "he did not make an offer of proof concerning the substance of what the excluded testimony would have been" (citing Tex. R. Evid. 103)); *In re M.G.N.*, 491 S.W.3d 386, 399 (Tex. App.—San Antonio 2016, pet. denied) (explaining offers of proof that preserve challenges to trial court's exclusion of evidence); *Akin v. Santa Clara Land Co.*, 34 S.W.3d 334, 339 (Tex. App.—San Antonio 2000, pet. denied) ("The failure to make an offer

---

[10] The record reflects that Mother cross-examined Father during the final hearing and that after Father's attorney questioned the guardian ad litem and "pass[ed] the witness," the trial court asked Mother if she had any questions for the guardian ad litem, and Mother responded, "No, Your Honor."

of proof containing a summary of the excluded witness's intended testimony waives any complaint about the excluded evidence on appeal.").

For these reasons, we overrule Mother's fifth and sixth issues.

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's order in suit to modify the parent-child relationship.[11]

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed:  March 7, 2024

---

[11] To the extent that Mother raises new arguments in her reply brief, they are waived, and we do not consider them. *See McKinnon v. Wallin*, No. 03-17-00592-CV, 2018 Tex. App. LEXIS 6349, at *12, n.11 (Tex. App.—Austin Aug. 14, 2018, pet denied) (mem. op.) (stating that appellate court did not consider arguments raised for first time in reply brief and that they were waived); *McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("An issue raised for the first time in a reply brief is ordinarily waived and need not be considered by this Court.").